IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

EUGENE DIVISION

SOUTHERN AGRICULTURAL
INSECTICIDES, INC.,

        Plaintiff,

vs.

DIRECTOR ALEXIS TAYLOR, Oregon
Department of Agriculture, et al.,

        Defendants.

Case No. 6:20-cv-00922-AA
**OPINION AND ORDER**

AIKEN, District Judge:

In this action, plaintiff Southern Agricultural Insecticides, Inc., seeks a declaration that final orders of the Oregon Department of Agriculture ("ODA" or "Department"), which prohibit plaintiff from selling and distributing its pesticide product in Oregon and impose a civil penalty for plaintiff's violation of Oregon law, are preempted by the Federal Insecticide Fungicide and Rodenticide Act ("FIFRA"), 7 U.S.C. § 136 *et seq.*, a comprehensive regulatory scheme for the use, sale, and labeling of pesticides. Plaintiff also seeks an injunction prohibiting defendants, Alexis Taylor, ODA Director, and Toby Prims and Michael Babbitt, ODA officials who work in the Department's Pesticide Program, from enforcing the orders against

plaintiff.  Now before the Court are the parties' cross-motions for summary judgment.
For the reasons that follow, plaintiff's Motion for Summary Judgment (doc. 20) is
DENIED and defendants' Motion for Summary Judgment (doc. 22) is GRANTED.

## BACKGROUND

The following facts are undisputed.  Plaintiff sells insecticide products,
including Triple Action Neem Oil ("TANO"), which plaintiff buys from the
manufacturer, Certis.  As a pesticide, TANO is regulated by the United States
Environmental Protection Agency ("EPA") under FIFRA and by ODA under Oregon's
Pesticide Control Act ("OPCA"), Oregon Revised Statutes ("ORS") Chapter 634.  The
ingredient list on TANO's label states that it is 70% Clarified Hydrophobic Extract of
Neem Oil, which is the active ingredient, and 30% inert ingredients.  Supp. Decl. of
Toby Primbs, Ex. 5 at 2 (doc. 25-3); Decl. of John C. Diem (doc. 21) ¶ 5; *id*. Ex 1 at 3;
Compl. ¶¶ 27–28, 30.  During the relevant period, TANO's label included a logo from
the Organic Materials Review Institute ("OMRI"), which stated "OMRI Listed for
Organic Use."  Compl. ¶ 33.

In February 2019, ODA issued an initial Stop Sale, Use, or Removal Order
("SSURO"), which alerted plaintiff that ODA's lab had tested some of plaintiff's
TANO product "found in the Oregon marketplace, for [certain] pesticidal active
ingredients."  Diem Decl. (doc. 21) Ex. 3 at 1.  The lab tests revealed trace amounts
of three substances not listed as active ingredients on TANO's label: 0.15 ppm of
malathion, 0.040 ppm of chlorpyrifos, and 0.24 ppm of permethrin.[1]  *Id*.  ODA

---

[1] The parties agree that these three substances can be used as pesticides but were not present
in the TANO at concentrations high enough to serve any pesticidal function.

concluded that the sale and distribution of this TANO in Oregon violated provisions of the OPCA. ODA ordered plaintiff to "cease all sales, offers of sale, or other distribution of" TANO in Oregon. *Id.*

Ultimately, ODA issued a Second Amended SSURO, which narrowed the scope of its order, limiting it to the single TANO lot that ODA had tested. ODA also limited the grounds for the order to two reasons: (1) the TANO lot was "adulterated" because it included three pesticidal active ingredients not identified in the product's label and (2) the lot was "adulterated" and "misbranded" because its label stated that it was "OMRI Listed for Organic Use," when the three substances "are not permitted in organic production." *Id.* Ex. 5 at 2–3 (citing ORS 634.032; ORS 634.036). With the Second Amended SSURO, ODA issued a Notice of Violation and Imposition of Civil Penalty and Proposed/Final Order ("NOV"), which set forth formal findings of fact and conclusions of law, consistent with the Second Amended SSURO, and proposed a $814.00 penalty for the adulterated product violation and no civil penalty for the misbranded product violation. *Id.* Ex 6. Plaintiff made a timely request for a hearing, but later withdrew that request, and the Second Amended SSURO and NOV became final orders of ODA on April 14, 2020. Decl. of Toby Primbs (doc. 23) Ex. 1 at 1.

In June 2020, plaintiff filed this action, alleging that ODA's Second Amended SSURO and NOV ("Final Orders") violate the Supremacy Clause because they are preempted by FIFRA. Doc. 1. The parties filed cross-motions for summary judgment on plaintiff's claims. Docs. 20, 22. The Court held oral argument on the motions on March 3, 2021. Doc. 36.

## STANDARDS

Summary judgment is appropriate if the pleadings, depositions, answers to interrogatories, affidavits, and admissions on file, if any, show "that there is no genuine dispute as to any material fact and the [moving party] is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Substantive law on an issue determines the materiality of a fact. *T.W. Elec. Serv., Inc. v. Pac. Elec. Contractors Ass'n*, 809 F.2d 626, 630 (9th Cir. 1987). Whether the evidence is such that a reasonable jury could return a verdict for the nonmoving party determines the authenticity of the dispute. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

The moving party has the burden of establishing the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). If the moving party shows the absence of a genuine issue of material fact, the nonmoving party must go beyond the pleadings and identify facts which show a genuine issue for trial. *Id.* at 324.

Special rules of construction apply when evaluating a summary judgment motion: (1) all reasonable doubts as to the existence of genuine issues of material fact should be resolved against the moving party; and (2) all inferences to be drawn from the underlying facts must be viewed in the light most favorable to the nonmoving party. *T.W. Elec.*, 809 F.2d at 630-31.

## DISCUSSION

In the Complaint, plaintiff alleged: (1) that the Final Orders are expressly preempted by FIFRA because they "impose a labeling requirement that is 'in addition

Page 4 – OPINION AND ORDER

to or different from' those required under" FIFRA, Compl. ¶¶ 46–53, and (2) that the Final Orders are impliedly preempted by FIFRA because "[i]t is impossible for [plaintiff] to comply with both EPA and ODA labeling requirements for TANO," *id.* ¶¶ 54–59.   Now, plaintiff contends that it is entitled to summary judgment on both claims.   Initially, defendants sought summary judgment on two grounds: (1) that plaintiff's claims were barred by claim preclusion and (2) that plaintiff cannot demonstrate that the Final Orders are preempted by FIFRA.   In their reply, defendants withdrew their claim preclusion arguments.   Accordingly, the only issues before the Court concern whether either party is entitled to a judgment as a matter of law on the merits of plaintiff's preemption claims.

Preemption arises under the Supremacy Clause of the United States Constitution.   "It is a familiar and well-established principle that the Supremacy Clause, U.S. Const. art. VI, cl. 2, invalidates state laws that interfere with, or are contrary to, federal law." *Hillsborough Cnty., Fla. v. Automated Med. Labs., Inc.*, 471 U.S. 707, 712 (1985).   "Congress has the constitutional power to preempt state law, and may do so either expressly—through clear statutory language—or implicitly." *Whistler Inv., Inc. v. Depository Trust & Clearing Corp.*, 539 F.3d 1159, 1164 (9th Cir. 2008) (internal citation omitted).   That said, the "preemption analysis begins with the presumption that Congress does not intend to supplant state law." *Tillison v. Gregoire*, 424 F.3d 1093, 1098 (9th Cir. 2005).

I.    ***Express Preemption***

Where Congress has superseded state legislation by statute, a court's task is to "identify the domain expressly pre-empted." *Dan's City Used Cars, Inc. v. Pelkey*, 569 U.S. 251, 260 (2013). FIFRA expressly preempts "any [state] requirements for labeling or packaging in addition to or different from those required in [FIFRA]." 7 U.S.C. § 136v(b). In other words, two conditions must be met for FIFRA to preempt a state requirement: "[f]irst it must be a requirement '*for labeling or packaging*'" and "[s]econd, it must impose a labeling or packaging requirement that is '*in addition to or different from* those required under [FIFRA].'" *Bates v. Dow Agrosciences LLC*, 544 U.S. 431, 444 (2005) (quoting § 136v(b); emphases in *Bates*).

In *Bates v. Dow Agrosciences LLC*, the Supreme Court interpreted the term "requirements" in § 136v(b) to include "positive enactments, such as statutes and regulations," as well as "common-law duties." 544 U.S. at 443. "Requirements" do not, however, include "any event, such as a jury verdict, that might 'induce' a manufacturer to change its label." *Id*. In other words, "[a] requirement is a rule of law that must be obeyed; an event . . . that merely motivates an optional decision is not a requirement." *Bates*, 544 U.S. at 445.

"The proper inquiry" in *Bates*, which concerned whether state law claims for product liability, breach of express warranty, fraud, and negligent failure-to-warn were expressly preempted by FIFRA, "call[ed] for an examination of the elements of the common-law dut[ies] at issue, . . . not for speculation as to whether a jury verdict will prompt the manufacturer to take any particular action." *Id*. Similarly, here, the

Court must examine the state laws applied in the Final Orders and not speculate on how plaintiff might choose to comply with the orders.

In the Final Orders, ODA relied on the OPCA's misbranding and adulteration provisions. As explained below, the Court concludes that the OPCA's misbranding provision is a requirement "for labeling or packaging" but its adulteration provision is not. Thus, ODA's Final Orders are not expressly preempted to the extent that they rely on violations of the OPCA's adulteration provision. Additionally, the Final Orders are not expressly preempted to the extent that they rely on violations of the OPCA's misbranding provision because the provision does not impose a broader or different obligation than FIFRA.

Under the OPCA, a pesticide is "misbranded" if "[t]he package or container of such materials bears any false or misleading statement." ORS 634.032(1). The misbranding provision, therefore, sets a standard for pesticide packaging by prohibiting "packag[ing that] bears any false or misleading statement." *Id*. Indeed, in *Bates*, the Supreme Court identified FIFRA's similar misbranding provisions as the FIFRA labeling requirements that state-law labeling requirements must be measured against. *See* 544 U.S. at 447. ("[A] state-law labeling requirement is not preempted by § 136v(b) if it is equivalent to, and fully consistent with, FIFRA's misbranding provisions.").

Turning to the OPCA's adulteration provision, a pesticide is "adulterated" under the OPCA if "[t]he strength or purity of the pesticide is below the purported or professed standard of quality as expressed in its labeling" or "[t]he contents of the

package or container of pesticide do not meet their purported standard of quality in any other manner." ORS 634.036(2), (3). Although this law mentions pesticide labeling and packaging, it does not impose any standards for labeling or packaging; that is, it does not require manufacturers or distributors to label or package their product in a particular way. Instead, it requires the pesticide product itself to conform to any standard of quality expressed by its manufacturer or distributor through any medium. Unlike the misbranding provision, which describes circumstances that render labeling or packaging unlawful, the adulteration provision assumes that the pesticide is properly labeled and packaged and describes circumstances that render the contents unlawful.

Because ODA imposed the same stop sale, use, and removal order for the adulteration and misbranding violations and the civil fine on adulteration grounds alone, the Court could grant defendants' summary judgment on plaintiff's express preemption claim solely based on the conclusion that the OPCA's adulteration provision is not a labeling or packaging requirement under FIFRA. But, out of an abundance of caution, the Court will continue with the *Bates* analysis to address whether the OPCA's misbranding provision is a labeling or packaging requirement "in addition to or different from" those required in FIFRA.

Under part two of the *Bates* test, "a state-law labeling requirement is not pre-empted by § 136v(b) if it is equivalent to, and fully consistent with, FIFRA's misbranding provisions[,]" 544 U.S. at 447, even if it is not "phrased in the *identical* language as its corresponding FIFRA requirement," *id.* at 454 (emphasis in original).

As the Ninth Circuit recently explained in *Hardeman v. Monstanto Co.*, "[s]tate law is 'equivalent to' and 'fully consistent with' FIFRA where both impose 'parallel requirements,' meaning that a violation of state law is also a violation of FIFRA." 997 F. 3d 941, 955 (9th Cir. 2021) (quoting *Bates*, 544 U.S. at 447, 454). Thus, "if a violation of [state law] would also be a violation of FIFRA's misbranding provision, then they impose parallel requirements fully consistent with each other." *Id*.

Here, the relevant OPCA misbranding provision is phrased in language that is nearly identical to its corresponding FIFRA provision. FIFRA's misbranding provision prohibits pesticide "labeling [that] bears any statement . . . which is false or misleading." 7 U.S.C. § 136(q)(1)(A). The OPCA's misbranding provision prohibits pesticide "packag[ing] or container[s] that . . . bear[] any false or misleading statement." ORS 634.032(1). Under FIFRA, "labeling" means "all labels and all other written, printed, or graphic matter . . . accompanying the pesticide . . . at any time[.]" 7 U.S.C. § 136(p)(2). And the term "label" means "the written, printed, or graphic matter on, or attached to the pesticide . . . or any of its containers or wrappers." *Id.* § 136(p)(1). Neither FIFRA nor the OPCA define the terms "package" or "container," so the Court assumes that they carry their plain meanings under both regulatory schemes. Thus, FIFRA's misbranding provision, which prohibits false and misleading statements on "all written, printed, or graphic matter . . . accompanying the pesticide . . . at any time," 7 U.S.C. § 136(p)(2), imposes a broader requirement than the OPCA's, which prohibits such statements only on packaging or containers. Thus, a violation of the OPCA's misbranding provision would also be a violation of

FIFRA's misbranding provisions, and the laws impose parallel requirements. Accordingly, ODA's Final Orders "effectively enforce FIFRA's requirement against misbranding and are thus not expressly preempted." *Hardeman*, 997 F.3d at 955.

Plaintiff, however, argues that the ODA's Final Orders are preempted here because they apply the OPCA's misbranding provision in a way that is not consistent with EPA's FIFRA regulations and policies.

ODA concluded that the TANO lot at issue was misbranded, in violation of the OPCA, because its label stated that it was "for organic use" when the TANO contained synthetic substances "not allowed in organic production, per 7 C.F.R. § 205.601." Doc. 23-1 at 11; *see also id.* at 14 ("The TANO product was misbranded under ORS 634.032(1) because the label stated that the product was 'OMRI Listed for Organic Use" but the product contained synthetic substances that are not permitted in organic production."). Section 205.601 is among the regulations promulgated by the United States Department of Agriculture to implement the National Organic Program ("NOP"), as authorized by the Organic Foods Production Act of 1990 ("OFPA"), 7 U.S.C. § 6501 *et seq.* 7 C.F.R. § 205.2 (defining NOP as "[t]he program authorized by [the OFPA] for purposes of implementing its provisions"); 7 U.S.C. § 6503(a) (directing the Secretary of Agriculture to "establish an organic certification program for producers and handlers of agricultural products that have been produced using organic methods as provided in [the OFPA]").

The OFPA directs the Secretary of Agriculture to establish a list of "approved and prohibited substances" for use in the "production and handling" of "products to

be sold or labeled as organically produced under [the OFPA]." 7 U.S.C § 6517(a). The NOP regulations, in turn, provide this list—the "National List," 7 C.F.R. § 205.2—across several regulations. As relevant here, substances prohibited by the National List include "synthetic substances and ingredients, except as otherwise provided in § 205.601 or § 205.603." 7 C.F.R. § 205.105(a). Section 205.601 provides a list of synthetic substances that are allowed in organic crop production.[2]

Here, the TANO label included the OMRI logo, which stated that the TANO was "OMRI Listed for Organic Use," but the three substances found in the TANO (malathion, chlorpyrifos, and permethrin) are synthetic substances not listed as allowed in organic crop production under § 205.601. They are therefore, as ODA concluded, not permitted for organic production under the NOP regulations. EPA's FIFRA regulation entitled "Labeling requirements," 40 C.F.R. § 156.10, provides a non-exclusive list of "statements or representations in the labeling which constitute misbranding" under FIFRA, which includes "[a] false or misleading statement concerning the composition of the product[.]" 40 CFR § 156.10(a)(5)(i). That example is broad enough to encompass ODA's rationale concerning the TANO's organic claim.

Nevertheless, plaintiff argues that ODA's Final Orders are preempted because they "would seem to impose a zero tolerance policy for the presence of contaminants or impurities in federally registered pesticides distributed within the State" that "EPA's regulations and policies under FIFRA do not impose." Pl.'s Mot. (doc. 20) at 16. According to plaintiff, at the concentrations found in the TANO, EPA would treat

---

[2] 7 C.F.R. § 205.603 provides a list of synthetic substances allowed in livestock production and is not relevant here.

the substances as contaminants or impurities and not ingredients. And plaintiff asserts that EPA permits organic claims on pesticide labels as long as the synthetic contaminants and impurities are in concentrations below the thresholds that render them "toxicologically significant" under EPA's Pesticide Registration Notice (PR Notice) 96-8. U.S. ENV'T PROT. AGENCY, PESTICIDE REGISTRATION (PR) NOTICE 96-8: TOXICOLOGICALLY SIGNIFICANT LEVELS OF PESTICIDE ACTIVE INGREDIENTS (Oct. 31, 1996).

Even assuming, for purposes of summary judgment, that the three substances found in the TANO are not "ingredients" within the meaning of FIFRA and EPA's regulations, plaintiff cannot show that, under FIFRA, TANO's label would not contain a "misleading statement" about its suitability for organic use simply because the three prohibited substances appear in concentrations that are not "toxicologically significant" under EPA's policy guidance.

Plaintiff relies on four regulations concerning contaminants, impurities, and toxicological significance found in 40 C.F.R. Parts 158 and 159. These regulations implement FIFRA's data and reporting requirements, do not concern labeling or packaging, and, therefore, do not "give content to FIFRA's misbranding standards." *Bates*, 544 U.S. at 453. Part 158 is entitled "Data Requirements for Pesticides," and "describes the minimum data and information EPA typically requires to support an application for pesticide registration or amendment; support the reregistration of a pesticide product; support the maintenance of a pesticide registration by means of the data call-in process . . . ; or establish or maintain a tolerance or exemption from

Page 12 – OPINION AND ORDER

the requirements of a tolerance for a pesticide chemical residue" under the Federal Food, Drug, and Cosmetic Act.  40 C.F.R. § 158.1(b)(1).  It also "establishes general policies and procedures associated with the submission of data in support of a pesticide regulatory action."  *Id.* § 158.1(b)(2).  Part 159 is entitled "Reporting Requirements for Risk/Benefit Information," and the regulations within it explain what a registrant or applicant must do to satisfy their continuing obligation to provide EPA with factual information on "unreasonable adverse effects" of the pesticide on humans or the environment under FIFRA and EPA's regulations.  40 C.F.R. § 159.152 ("Compliance with this part will satisfy a registration's obligation to submit additional information pursuant to [7 U.S.C. § 136d(a)(2)] and will satisfy an applicant's obligation to submit additional information pursuant to [40 C.F.R.] § 152.50(f)(3).").

Nothing in these parts mention labeling or packaging.  Nor do the regulations in these parts suggest any connection between data submission and adverse effect reporting obligations under FIFRA and the regulations' distinct parts on labeling and packaging, 40 C.F.R. Parts 156 ("Labeling Requirements for Pesticides and Devices") and 157 ("Packaging Requirements for Pesticides and Devices"), let alone FIFRA's misbranding prohibition and EPA's misbranding regulations.  The regulations cited by plaintiff—40 C.F.R. §§ 158.320, 158.340 and 158.355, and 159.179(b)—are, therefore, not relevant to the preemption inquiry under § 136v(b).  As a result, PR Notice 98-6, which provides an EPA interpretation of "toxicologically significant" as it appears in Part 158, is also irrelevant here.

Plaintiff also argues that the OMRI logo would be permitted on the TANO, despite the presence of the synthetic substances, under PR Notice 2003-1. PR Notice 2003-1 describes how registrants can obtain EPA approval of label language indicating that a pesticide product meets the requirements of USDA's NOP rules for use in organic agriculture. Before Congress passed the OFPA and USDA promulgated the NOP regulations, EPA "generally regarded statements such as 'organic' to be forms of false or misleading safety claims prohibited by [FIFRA] and EPA's labeling regulations" because it "believed such claims could not be well defined[.]" U.S. ENV'T PROT. AGENCY, PESTICIDE REGISTRATION (PR) NOTICE 2003-1: LABELING OF PESTICIDE PRODUCTS UNDER THE NATIONAL ORGANIC PROGRAM 3 (Jan. 31, 2003). After USDA issued its original version of the National List, EPA reevaluated its policy in light of the OFPA and NOP and determined that "a statement 'for organic production' is an acceptable labeling statement under certain conditions." *Id*. In PR Notice 2003-1, EPA explained that registrants can obtain such approval if "each ingredient in the [pesticide], including active and inert ingredients, [is] allowable under The National List . . . contained in 7 CFR part 205" and all uses of the pesticide meet the NOP criteria. *Id*. at 4. Later, EPA issued a clarification of PR Notice 2003-1 explaining that the OMRI logo "will be allowed on pesticide products that would also be acceptable for EPA's 'For Organic Production' . . . designation . . . as long as an official OMRI logo is used and the product meets the NOP standards." *Clarification of PR Notice 2003-1*, U.S. ENV'T PROT. AGENCY (Dec.

16, 2020), https://www.epa.gov/pesticide-registration/clarification-pr-notice-2003-1 (last visited Sept. 22, 2021).

Plaintiff asserts that PR Notice 2003-1 establishes FIFRA requirements for including the OMRI logo on pesticide labels. Plaintiff argues that, because PR Notice 2003-1 addresses active and inert ingredients but not impurities, FIFRA "does not regulate or prohibit [the OMRI logo's] use based on the impurities in the products." Pl's Reply (doc. 30) at 6–7. Even if the Court assumes that the three substances at issue here are not "ingredients" of the TANO within the meaning of FIFRA, PR Notice 2003-1 does not preempt ODA's Final Orders because it does not carry the force of law.

Although, in *Bates*, the Supreme Court instructed that "[s]tate-law requirements must also be measured against any relevant EPA *regulations* that give content to FIFRA's misbranding standards[,]" *Bates*, 544 U.S. at 453 (emphasis added), courts do not consider less formal agency action or policies that do not "carry[] the force of law," *Hardeman*, 997 F.3d 957. As the Ninth Circuit noted in *Hardeman*, because a "requirement is a rule of law that must be obeyed. . . . To establish requirements that can preempt state law under § 136v(b), agency action must have the force of law." *Id.* at 956–57 (internal quotation marks and citations omitted).

The Ninth Circuit then concluded that a 2019 letter from EPA informing registrants that the agency considered certain warning language to be a violation of FIFRA's misbranding prohibition did not "carry the force of law." *Id.* at 957. The Court explained, "[g]enerally Congress contemplates administrative action with the

Page 15 – OPINION AND ORDER

effect of law when it provides for a relatively formal administrative procedure to foster fairness and deliberation that would underlie a pronouncement of such force." *Id.* (internal quotation marks omitted).  Because the letter "was issued without any written notice, gave no hearing or opportunity to respond, and lacked any sort of dispute resolution process[,]" it "did not follow any formal administrative procedure that would give the letter the force of law" and, therefore, lacked preemptive effect. *Id.*

Similarly, PR Notice 2003-1 was issued without prior notice to interested parties, without a hearing or opportunity to respond, and without any sort of dispute resolution process.  Although plaintiff emphasizes that EPA published PR Notice 2003-1 in the Federal Register, EPA did so months after issuing the PR Notice itself. *See* 68 Fed. Reg. 10477 (Mar. 5, 2003) (stating that EPA "is announcing the availability of a pesticide registration notice" that "was issued by [EPA] on January 31, 2003").  And, unlike other PR Notice-related Federal Register notices, EPA's notice for PR Notice 2003-1 did not provide for a public comment period.  *See* 85 Fed. Reg. 70146 (Nov. 4, 2020) (stating that EPA "is announcing the availability of and seeking public comment on a draft Pesticide Registration Notice" and setting a January 4, 2021 deadline for comments).

Moreover, in the Federal Register notice, EPA expressly denied that PR Notice 2003-1 was legally binding in any way:

> The PR Notice discussed in this notice is intended to provide guidance to EPA personnel and decision makers and to pesticide registrants. While the requirements in the statutes and Agency regulations are binding on EPA and the applicants, *this PR Notice is not binding on*

> *either EPA or pesticide registrants, and EPA may depart from the guidance where circumstances warrant and without prior notice.* Likewise, pesticide registrants may assert that the guidance is not appropriate generally or not applicable to a specific pesticide or situation.

68 Fed. Reg. 10477 (emphasis added); *see also Pesticide Registration Notices by Year*, U.S. ENV'T PROT. AGENCY (July 6, 2021), https://www.epa.gov/pesticide-registration/pesticide-registration-notices-year (last visited Sept. 22, 2021) ("Pesticide Registrations Notices are issued . . . to inform pesticide registrants and other interested persons about important policies, procedures and regulatory decisions. *They do not create new legally binding requirements*." (emphasis added)). Because EPA did not follow any formal administrative procedure before issuing PR Notice 2003-1 and views it as non-binding guidance from which the agency may depart without prior notice, the PR Notice cannot preempt ODA's Final Orders.

In sum, because the OPCA's adulteration provision is not a "labeling or packaging" requirement and because ODA's application of the OPCA's misbranding provision is fully consistent with FIFRA's misbranding provisions and EPA's misbranding regulations, ODA's Final Orders are not expressly preempted by FIFRA.

**II.    *Implied Preemption***

In the absence of express preemptive language, courts may infer Congress' intent to preempt state law in two instances:  (1) when "federal law occupies a legislative field to such an extent that it is reasonable to conclude that Congress left no room for state regulation in that field" or (2) when "state law conflicts with federal

law". *Chae v. SLM Corp.*, 593 F.3d 936, 941 (9th Cir. 2010) (internal quotation marks omitted).[3]

Plaintiff briefly argues that ODA's Final Orders are "impliedly preempted" because "ODA's position requires finding that [plaintiff] violated Oregon law without violating FIFRA[.]" Pl's Mot. for Summ. J. (doc. 20) at 20. But FIFRA's provision concerning the authority of states, 7 U.S.C. § 136v, forecloses "field preemption" theories of implied preemption. The Court cannot conclude that Congress left "no room" for state regulation of pesticides when § 136v(a) expressly permits state regulation of the "sale or use of any federally registered pesticide," as long as the state "does not permit any sale or use prohibited by [FIFRA]." Nor can the Court conclude that Congress intended to occupy the field of pesticide labeling when it chose to specify that states "shall not impose" labeling or packaging requirements only to the extent that the requirements are "in addition to or different from those required under [FIFRA]." 7 U.S.C. § 136v(b). As the Supreme Court acknowledged in *Bates*, FIFRA "authorizes a relatively decentralized scheme that preserves a broad role for state regulation." 544 U.S. at 451 (citing § 136v).

---

[3] Defendants argue that there is no implied preemption under FIFRA. Courts have rejected claims of implied preemption under FIFRA as inconsistent with *Bates* and the Congressional intent expressed in § 136v. *See Ansagay v. Dow Agrosciences LLC*, 153 F. Supp. 3d 1270, 1280–82 (D. Hawai'i 2015) (rejecting defense of implied preemption under FIFRA, noting that the procedural history of *Bates* indicates that the *Bates* Court rejected impossibility preemption *sub silentio*, which is consistent with Congress's intent to allow states broad authority under FIFRA to regulate pesticides through state law); *In re Roundup Products Liab. Litig.*, 364 F. Supp. 3d 1085, 1088 (N.D. Cal. 2019) (following *Ansagay* analysis in rejecting defense of implied preemption under FIFRA); *see also Bates v. Dow Agrosciences LLC*, 544 U.S. 431, 458 (2005) ("Because we need only determine the ordinary meaning of [FIFRA] § 136v(b), the majority rightly declines to address respondent's argument that petitioners' claims are subject to other types of pre-emption.") (Thomas, J., concurring). The Court finds this reasoning persuasive. Nevertheless, the Court will address the merits of plaintiff's implied preemption claim because, even if FIFRA can impliedly preempt state law, plaintiff's claim fails.

Next plaintiff argues that ODA's Final Orders are preempted because it is impossible for plaintiff to comply with both the Final Orders and FIFRA. State laws are preempted if they "irreconcilably conflict" with federal law. *Merck Sharp & Dohme Corp. v. Albrecht*, 139 S. Ct. 1668, 1679 (2019). "[S]tate and federal law conflict where it is impossible for a private party to comply with both state and federal requirements." *PLVIA, Inc. v. Mensing*, 564 U.S. 604, 618 (2011) (internal quotation marks omitted). A party asserting impossibility preemption must present "clear evidence" of impossibility, the "possibility of impossibility is not enough." *Merck*, 139 S. Ct. at 1678 (internal quotation marks omitted and alterations normalized). "Impossibility preemption is a demanding defense[,]" *Wyeth v. Levine*, 555 U.S. 555, 573 (2009), and plaintiff's arguments are unpersuasive.

Plaintiff asserts that the Final Orders impose a state law duty on plaintiff to disclose the presence of the three substances in the ingredient list on the TANO label, which would violate FIFRA. According to plaintiff, its TANO label must be identical to the label that Certis submitted to EPA for approval, subject to a few exceptions that do not include the ingredient list. But, as discussed above, the OPCA's adulteration provision does not impose any labeling duty. And ODA's misbranding conclusion was based on the OMRI logo, not TANO's ingredient list. Additionally, plaintiff could comply with the Final Orders and Oregon law without changing TANO's ingredient list. The Final Orders to not expressly require plaintiff to change TANO's label, the only things they require plaintiff to do is to stop selling the adulterated and misbranded lot of TANO in Oregon and to pay a civil penalty.

And, as defendants point out, plaintiff does not need to change TANO's label to comply with ODA's application of Oregon law in the future. Plaintiff could comply with both FIFRA and the OPCA by ensuring that its TANO product does not contain malathion, chlorpyrifos, or permethrin. Although plaintiff asserts that FIFRA prohibits it from changing the manufacturing process for Certis' FIFRA-registered Neem Oil, plaintiff failed to offer any evidence that it cannot, either under FIFRA or as a practical matter, test the product that it receives from Certis and either reject any that contain prohibited levels of the three substances or sell that product in states other than Oregon. Even if Certis could not eliminate the three substances from its product, or reduce the concentration below ODA's reporting levels, effectively prohibiting TANO's sale, use, or distribution in Oregon, under FIFRA, states may ban or restrict the sale or uses of pesticides that EPA has approved. 7 U.S.C. § 136v(a).

## CONCLUSION

For the reasons above, defendants are entitled to summary judgment on plaintiff's express and implied preemption claims. Plaintiff's Motion for Summary Judgment (doc. 20) is DENIED and defendants' Motion for Summary Judgment (doc. 22) is GRANTED.

IT IS SO ORDERED.

Dated this  24th  day of September 2021.

_____/s/Ann Aiken_____
Ann Aiken
United States District Judge